STATE OF LOUISIANA        *        NO. 2019-KA-0416

VERSUS        *

KERRIC BROWN        *        COURT OF APPEAL

       *        FOURTH CIRCUIT

       *        STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 527-162, SECTION "D"
Honorable Paul A Bonin, Judge
\* \* \* \* \* \*
**Judge Daniel L. Dysart**
\* \* \* \* \* \*
(Court composed of Judge Roland L. Belsome, Judge Daniel L. Dysart, Judge
Paula A. Brown)

Leon Cannizzaro
DISTRICT ATTORNEY
Donna Andrieu
CHIEF OF APPEALS
Irena Zajickova
ASSISTANT DISTRICT ATTORNEY
PARISH OF ORLEANS
619 S. White Street
New Orleans, LA 70119
       COUNSEL FOR APPELLEE/STATE OF LOUISIANA

Meghan Harwell Bitoun
Louisiana Appellate Project
P. O. Box 4252
New Orleans, LA 70178-4252
       COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**

**JANUARY 29, 2020**

Kerric Brown appeals his conviction on one count of armed robbery with a firearm (La. R.S. 14:64.3), one count of second degree kidnapping (La. R.S. 14:44.1), and one count of aggravated battery (La. R.S. 14:34). For the reasons that follow, we affirm the convictions.

**PROCEDURAL BACKGROUND:**

On November 13, 2015, Brown was charged by bill of information with two counts of armed robbery with a firearm, one of Steve Martin and one of Mia Carey; one count of aggravated burglary; and two counts of second degree kidnapping, one of Steve Martin and one of Mia Carey.

A bench trial was commenced on December 17, 2018, wherein Brown was tried on the charges of armed robbery with a firearm, aggravated battery, and the second degree kidnapping of Mia Carey. He was found guilty as charged. The trial court subsequently denied Brown's motions for a new trial and for post-verdict judgment of acquittal.

Sentencing took place on January 11, 2019. The trial court sentenced Brown, with respect to the armed robbery with a firearm, to serve twenty years, without benefit of probation, parole or suspension of sentence, with an additional five years pursuant to La. R.S. 14:64.3, to be served consecutively with the twenty years. With respect to the second degree kidnapping conviction, Brown was sentenced to serve twenty-five years, with two years to be served without benefit of probation, parole or the suspension of sentence, with credit for time served. Finally, with respect to the conviction for aggravated battery, Brown was sentenced to serve eight years with credit for time served. All sentences were to run concurrently; however, the court specified that they were to run consecutively with a sentence imposed by the court in an earlier, unrelated proceeding.

The State notified the trial court of its intention to file a bill charging Brown as a multiple offender; however, prior to the hearing on the multiple bill, Brown's motion for appeal was filed and granted.

**FACTS:**

Mia Carey testified that on May 3, 2015, she and her boyfriend, Steve Martin, drove Martin's cousin, Raychad Newton, to an apartment in eastern New Orleans. Newton had asked for a ride to drop something off at his uncle's apartment. Carey testified that she and Martin waited in her car while Newton went upstairs. Shortly thereafter, a man approached the car and asked to use Carey's cellphone. After handing him the phone, he pointed a gun in her face and ordered her out of the car. He then went to the passenger side and ordered Martin

at gunpoint to get out of the car, and ordered the two to go up the stairs of the building. On the way up, another man that Carey described as the gunman's "friend," passed them and ordered them not to look at him. The gunman and his "friend" drove away in Carey's car.

Carey and Martin proceeded to the apartment that Newton had entered earlier. She testified that they found Newton naked on the floor covered in blood, apparently having been stabbed numerous times. She and Martin went to Martin's cousin's apartment and called the police.

Carey testified that in September of 2015, she and Martin went to the police station with an Instagram photo Martin had obtained from a friend. She said the photo was of the man who had pointed the gun in her face and another unknown person. They gave the Instagram photo to the detective. Several days later, she was called back to the station and asked to pick the gunman from a photo line-up. She testified that there was one man who had the same eyes and bridge of the nose as the gunman, but she could not positively identify him as the man who pointed the gun at her. She admitted on cross-examination that she did not tell the police on the day of the incident that the gunman had a cross tattooed in the middle of his forehead; however, she did tell the detective who showed her the lineup. She further explained that the tattoo on the defendant's forehead was clearer in the Instagram photo.

Raychad Newton testified that on May 3, 2015, he went to his uncle's apartment to deliver marijuana. Newton identified Brown as the man who was in

his uncle's apartment when he arrived.  As he handed his uncle the marijuana, he turned towards Brown who hit him with a gun.  He testified that he and Brown "tussled" over the gun, with Newton gaining possession of it.  Newton testified that Brown's friend, whom he described as having dreadlocks, went to the kitchen, returned and proceeded to stab Newton numerous times in his back and head.  This caused Newton to release his grip on the gun.  Brown then kicked him and ordered him to strip to naked, and told him to "put your ass in your uncle's face."

Newton testified that after he complied, Brown asked him how he got to the apartment.  Newton testified that he was evasive about how he got to the apartment because he was afraid for his cousin.  Brown left the apartment and returned a few minutes later with Carey and Martin.  Brown then left the apartment with his accomplice.  Newton then called 911.

Detective Matthew Riffle of the New Orleans Police Department testified that he became involved in the case when Carey and Martin came to the Seventh District headquarters on September 3, 2015 with an Instagram photo of the defendant.  They told him that one of the people in the photo, who they said was nicknamed "K.K.," was the person who had kidnapped and robbed them at gunpoint on May 3, 2015.

After Carey and Martin left the station, Detective Riffle ran the nickname through a "Field Interview Cards" database[1] and had one result, the defendant,

---

[1]  A database that comprises photographs and information on persons stopped by police for suspected criminal violations.

Kerric Brown. He then compared a booking photograph of Brown, who was at that time in police custody, with the Instagram photo which was a perfect match.

Detective Riffle testified that he thereafter compiled a "six-pack" photographic lineup and asked Carey and Martin to return, which they did on September 15. Two different police officers presented the line-ups to the victims separately. Carey, although noting that the picture of one person (Brown) had the same eyes and bridge of the nose as the man who pointed the gun at her, could not make a positive identification. Martin, on the other hand, positively identified Brown as the man who had robbed him.

On cross-examination, Detective Ripple explained that Carey and Martin told him the Instagram photo came from a neighbor, who, after hearing about the incident and having the victims describe the gunman, told them it sounded like a man named "K.K."

The judge also questioned Detective Ripple about the sequence of events, the different line-ups, and about the second robber involved in the May 3 incident. Detective Ripple explained that Carey's car was found on May 4, and a man named Christopher Payton was arrested for the theft. The detective thought that Payton could have been the second robber from the May 3 incident. However, when Martin was presented with a line-up including Payton's picture, Martin selected a "filler"[2] picture of a man named Reginald Vincent. Vincent was not a suspect.

---

[2] A "filler" picture in a police photo line-up is a picture of a person who is not a suspect.

**DISCUSSION:**

We have reviewed the record for errors patent, and find none.

When the sufficiency of the evidence to convict is raised as error on appeal, it is well settled that the reviewing court should first review the record to determine the sufficiency of the evidence. See *State v. Miner*, 14-0939, p. 5 (La.App. 4 Cir. 3/11/15), 163 So.3d 132, 135.

We review a claim of insufficiency of the evidence as set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved though a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (emphasis in original; internal quotations omitted.)

In this case, Brown does not argue that the trial testimony was insufficient to support the elements of the crimes charged. Rather, he claims that the testimony identifying him was insufficient to prove he was the perpetrator.

"[W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification." *State v. Weary,* 03-3067, p. 18 (La. 4/24/06), 931 So.2d 297, 311, quoting *State v. Neal,* 00-0674, p. 11 (La. 6/29/01),

796 So.2d 649, 658. A "positive identification by only one witness is sufficient to support a conviction." *Id.*

Despite the strong in-court identifications, Brown nonetheless argues that the police failed to follow up on two other possible perpetrators discovered during the investigation. Christopher Payton was the man who was found in possession of Carey's vehicle the day after the incident. Detective Ripple included a picture of Payton in the photographic line-up shown to Steve Martin, but Martin failed to identify him as the second perpetrator. The detective did not show this line-up to Carey, as she had indicated that she did not see the face of the second perpetrator at all. When Martin did not identify Payton as being the other person involved in the incident, the detective did not pursue him as a possible suspect.

Martin did pick a man, Reginald Vincent, out of the photographic lineup as possibly being the second perpetrator. The detective did not follow up on this identification as Martin had explained that he only saw "half of the suspect's face" as they passed on the stairs, and there was no other evidence to link Vincent to the crime.

Brown also argues that Carey could not pick him out of the photographic line-up. What Brown ignores is the fact that Carey positively identified him at trial, both at a distance and once he was brought closer to her on the stand. Also, Carey did in fact note that a man in the lineup (Brown) had the same eyes and bridge of the nose as the man who pointed the gun in her face. She hesitated to

7

positively identify Brown because she was not absolutely certain. There was no uncertainty in her identification at trial.[3]

Brown also challenges the use of the Instagram photograph supplied by a neighbor/friend of Carey and Martin's. He argues that it was not established how Carey and Martin came to possess the photograph. The record reveals that Martin explained to the detective that he described the perpetrator to this neighbor/friend, who produced the picture of Brown.

Brown also challenges Newton's identification of him, arguing that Newton never picked him out of a lineup. While this is true, the fact is of no moment as Newton positively identified Brown at trial. Newton was confronted face-to-face by Brown, they fought over a gun, and Newton was made to strip naked at Brown's command. Newton's identification at trial was unequivocal.

Thus, the trial court heard the testimony of the two witnesses and witnessed their positive identification of Brown at trial. The record is clear that there was sufficient, positive identification of Brown as the perpetrator in this case.

Brown challenges in a separate assignment of error, the in-court identifications by Carey and Newton. He argues that the trial court should have denied the State's request to have Brown brought closer to Carey in the courtroom. The State's request was made so that Carey could see Brown at the same distance he was from her when he pointed the gun in her face. He argues that Carey was not able to identify him from the stand to where he sat in the courtroom. This is

---

[3] Martin, although not called to testify at trial, did positively identify Brown in the photographic lineup.

8

inaccurate. Carey identified Brown as he was seated at the defense table, and confirmed the identification when he was brought closer.

Louisiana Code Criminal Procedure art. 703 D provides that the defendant bears the burden of proving that an identification should be suppressed. The defendant must first prove that the identification procedure was unduly suggestive. If he carries his initial burden, the defendant must then prove that the unduly suggestive procedure created "a very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite,* 432 U.S. 98, 116, 97 S.Ct. 2243, 2254 (1977); *see also State v. Leger*, 05-0011, p. 59 (La. 7/10/06), 936 So.2d 108, 151 (quoting *Manson, supra)*. The standard for review of a trial court's ruling on an identification is abuse of discretion. *State v. Bickham,* 404 So.2d 929, 934 (La. 1981). As this was a challenge to an identification during the course of the trial, no motion to suppress was filed. Rather, the defense objected to Carey's identification, and the trial court overruled the objection.

In addition to objecting to the identification, Brown also had the benefit of cross-examining the witnesses who identified him. Generally, the opportunity to cross-examine a witness about his in-court identification of the defendant will cure any suggestiveness of such identification. *State in the Interest of D.S.,* 18-0458, p. 6 (La.App. 4 Cir. 10/3/18), 255 So.3d 1209, 1213, citing *State v. Laster*, 44,870, p. 11 (La.App. 2 Cir. 2/3/10), 33 So.3d 259, 267.

When weighing the effect of an arguably suggestive identification, courts consider five factors: 1) the opportunity of the witness to view the criminal at the

time of the crime, 2) the witness' degree of attention, 3) the accuracy of the witness' description of the criminal, 4) the level of certainty demonstrated by the witness at the confrontation, and 5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972).

Brown relies heavily on the fact that Carey could not identify him in the photographic lineup, yet positively identified him at trial. Again, it is not entirely accurate that Carey did not select Brown from the photographic lineup. In fact, Carey did note that one of the men in the lineup had the same eyes and bridge of the nose as the man who pointed a gun in her face. She did not, however, positively identify Brown from that photo. Carey did positively identify Brown as the perpetrator in the Instagram photo, which she explained was a clearer picture. At trial, she identified Brown as he sat at the defense table and when he was brought closer. Although trial of this matter was approximately four years after the incident, her identification of Brown from the Instagram photo was only four months after the crime.

On appeal, Brown also challenges Newton's in-court identification. However, there was no objection raised at the trial; therefore, he cannot raise the identification as error for the first time on appeal. La. Code Cr. Proc. art. 841 A; *State v. Hill*, 16-0123, p. 10 (La.App. 4 Cir. 6/1/16), 194 So.3d 1262, 1268.

Brown argues that the trial court erred in not granting him a new trial because the State withheld evidence. Specifically, Brown asserts that the State was required to notify him of the fact that Brown identified himself during the crime.

10

La. Code Cr. Proc. art 716 C obligates the State to provide defendant with the substance of any oral statement made by the defendant which the State intends to offer at trial.

During questioning by the judge at trial, Newton was asked why he referred to the defendant as "K.K." Newton replied that "K.K." was Brown's nickname. The judge asked Newton if he knew Brown prior to this incident, to which Newton explained he did not; however, Brown referred to himself as "K.K." when he was beating Newton with the gun and accusing Newton of having hit Brown's brother with a gun. Brown argues that if he had known of Newton's testimony, he could have impeached him because Brown's only brother had been incarcerated since 2007. It was thus impossible for Newton to have had contact with Brown's brother in the recent past. Brown argues that the State withholding this information was a violation of *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763 (1972), which held that the prosecution is bound to give impeachment evidence to an accused.

For the State to be bound by La. Code Cr. Proc. 716 C and *Giglio,* the State must have been aware of the evidence and have intended to offer it at trial. The testimony at trial indicates that during questioning by the judge it was revealed that Newton believed Brown's nickname to be "K.K." On cross-examination Newton stated that he had not told the State about Brown's alleged statement at the time of the crime. Newton also explained that he did not tell the officers at the scene as he was in severe pain from being stabbed, nor did he tell the officers later the same week when he met with them. Newton stated that the officers were more interested

11

in the marijuana he had delivered to his uncle than in investigating the stabbing.

As such, Newton's testimony was not impeachment evidence.  The trial court did

not err in denying Brown's motion for new trial.

Accordingly, for the reasons set forth above, we affirm the convictions.


**AFFIRMED**